# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARY MAYK,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 08-4866** |
| | : | |
| **READING EAGLE COMPANY,** | : | |
| **Defendant** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                              **March   24, 2010**

Gary Mayk brings this case against the Reading Eagle Company, his current employer, alleging employment discrimination based on age and disability.  The three-count complaint asserts two violations of the Age Discrimination in Employment Act ("ADEA") of 1967, 29 U.S.C. §§ 621, *et seq.*, and a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*  The defendant has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the following reasons, I will grant the motion in its entirety, and enter judgment in favor of the defendant.

## I.  BACKGROUND

Gary Mayk was born on February 22, 1951, and has been employed by the defendant newspaper since 1996 when he was hired as a part-time copy editor by Charles Gallagher,[1] the Managing Editor.  *See* Mayk Dep. at 11, 25.  Later, Mr. Mayk became a

---

[1]  Mr. Gallagher was born in 1942, and retired in January 2008.  *See* Gallagher Aff. ¶ 2.

full-time copy editor and was responsible for editing stories for grammar, fairness and factual accuracy, writing headlines and captions, designing inside pages of the newspaper, and performing related work. See Mayk Dep. at 11-13, 26. In 1998, Mr. Mayk was promoted to Metro Editor and became responsible for supervising half of the defendant's reporters and directing them to create content for the newspaper, focusing on the Reading suburbs. Id. at 26-27.

In 2000, Mr. Mayk asked for and was given a demotion to copy editor because of stress, depression, and severe migraines. Id. Mr. Mayk shared this medical information with management as an explanation for his request for demotion. Id. at 30. Even though the copy editor position was a demotion, the defendant continued to pay Mr. Mayk the same higher salary he received as Metro Editor. Id. at 28; see also Deitz Aff. ¶ 4; Gallagher Aff. ¶ 3.

Throughout the years, the defendant accommodated Mr. Mayk's requests to work various schedules. He currently works Friday through Tuesday, allowing him to have two consecutive days off each week. See Mayk Dep. at 14-15. The defendant has also granted Mr. Mayk's requests for time off or for additional breaks at work due to his migraine headaches. Id. at 29-30. On several occasions, he took extended leaves from work for both physical and mental health reasons. Id. at 44-45. Upon return from these leaves, Mr. Mayk experienced no effect on his position or status with the defendant. Id. at 46. He also conceded that he received no formal disciplines, suspensions, decreases in

pay, or other punishment during his employment with the newspaper.  Id. at 49.

In April 2006, Mr. Mayk received an annual performance review which noted he needed to focus on his job and work on his anger issues.  Compl. ¶¶ 11-12.  The review's overall score, however, was "above required," the highest score the company offers.  Id.  Mr. Mayk's job performance continues to be exemplary.  See Mayk Dep. at 32.  Mr. Mayk testified that he does not think he continues to have occasional angry outbursts at work.  Id. at 37.

In June 2006, News Editor John Forester[2] asked Mr. Mayk to edit a series of stories on mental illness.  See Mayk Dep. at 38.  Mr. Mayk felt that Mr. Forester asked for his help to ensure the accuracy of the series, and because Mr. Forester was expressing confidence in Mr. Mayk's work, rather than because of Mr. Mayk's own mental health issues.  Id. at 38, 41.  On the second day of the series, Mr. Mayk noticed a notation in the margin of a story he had edited which stated: "what does this mean to the average loony-toon" referring to people with mental illness.  Id. at 38.  This remark offended and insulted Mr. Mayk, but he declined to employ the defendant's mechanism to complain about the harassment due to fear of retaliation.  Id. at 38-39, 41, 42.  Mr. Forester admitted that he had written the note, but did not apologize to Mr. Mayk.  Id. at 39.  The remark was also posted briefly on the newspaper's website, but not in the newspaper itself.  Id. at 41.  As soon as the remark came to its attention, the defendant's management

---

[2]  Mr. Forester was born in 1947.  See Deitz Aff. ¶ 10.

3

agreed that the notation was inappropriate and it was removed.  See Deitz Aff. ¶ 5; see also Gallagher Aff. ¶ 4.  Mr. Forester was counseled for his poor judgment.  Id.

Mr. Mayk admitted that other than this one remark, Mr. Forester did not make any other offensive comments.  Id. at 41.  In fact, there were no other comments from anyone else at work which were offensive to Mr. Mayk.  Id. at 42.  Once, however, when Mr. Mayk complained to Editor Harry Deitz[3] about not being named a writing coach,[4] Mr. Deitz responded, "you had a chance to be a key part of this team and you chose not to."  Id. at 46; see also Deitz Aff. ¶ 6.  Mr. Mayk viewed this response as evidence that he was being punished.  See Mayk Dep. at 48-49.  Mr. Deitz indicated that his response was not intended to reflect an attitude of punishment to Mr. Mayk but to explain to whom the responsibility of coaching writing belongs.  See Deitz Aff. ¶ 6.  The reporters Mr. Mayk wanted to coach were supervised by Metro Editor Jim Kerr whose responsibility it was to supervise reporters including coaching them on their writing.  Id.  Mr. Deitz told Mr. Mayk that he anticipated that his input would be welcome when it came to coaching the writers but that he would need to speak with Mr. Kerr before coaching them.  Id.  In fact, Mr. Mayk currently is sought out by interns and reporters at the newspaper for writing

---

[3]  Mr. Deitz was born in 1952.  See Deitz Aff. ¶ 2.  He became the Managing Editor of the newspaper in 2006, and its Editor in 2008.  Id.

[4]  In his affidavit, Mr. Deitz indicated that the defendant newspaper has never had and still does not have a "writing coach."  See Deitz Aff. ¶ 6.  The coaching of a reporter's writing is done by the reporter's direct supervisor.  Id.  Mr. Mayk testified that there was no provision for additional compensation for working as a writing coach, and he did not ask for any.  See Mayk Dep. at 57.

assistance, and he has provided such assistance since 2008.  Compl. ¶¶ 35-36.

Mr. Mayk also testified that management asked its employees to set goals for themselves each year in addition to the goals management set for them.  <u>See</u> Mayk Dep. at 32-33.  Other copy editors informed Mr. Mayk that they presented various goals to management, and management considered those goals and permitted the copy editors to try to meet their goals.  <u>Id.</u> at 37.  Mr. Mayk testified that his goals were not given such consideration.  <u>Id.</u>  In 2002, one of the goals Mr. Mayk set for himself was to write a column for the newspaper.  <u>Id.</u> at 32-33.  When Mr. Mayk asked if he could write such a column, he was allegedly told that he was not permitted to submit a periodical column but that he could perhaps submit one for "Sound Off," a column which was open to anyone on the staff.  <u>See</u> Compl. ¶¶ 26, 27.  When Mr. Mayk discussed a potential article for "Sound Off," Mr. Gallagher refused to approve it because the topic was "too liberal."  <u>Id.</u> ¶ 30.  Mr. Mayk also indicated that he was denied a column because the defendant wanted him to focus on his job rather than taking on additional responsibilities.  <u>See</u> Mayk Dep. at 36.

In his affidavit, Mr. Gallagher indicated that at some point Mr. Mayk suggested a column pertaining to home remodeling.  <u>See</u> Gallagher Aff. ¶ 5.  Mr. Gallagher directed Mr. Mayk to address that topic with the Marketing Department which was responsible for those types of stories.  Mr. Mayk declined to do so.  <u>Id.</u>  Other times, when Mr. Mayk requested to be permitted to write a column, Mr. Gallagher told him to submit the idea

and three columns for consideration in keeping with the newspaper's practice.[5]  <u>Id.</u>  Mr.

Mayk again declined.  <u>Id.</u>

      Mr. Mayk testified that younger reporters, i.e., those thirty years old and younger,

were offered the opportunity to submit three columns for consideration to be a columnist.

<u>See</u> Mayk Dep. at 51.  Three of those reporters "suggested that they should be able to

write columns because they are young and that, therefore, they would appeal to young

readers."  <u>Id.</u>  The defendant allegedly decided "that all those young reporters would get

columns," and ran "advertisements boasting that it had asked all of its young reporters to

write columns."  <u>Id.</u> at 52.  Mr. Mayk claims that no such offer was extended to the

newspaper's older staff members.  <u>Id.</u>

      I note that even if Mr. Mayk had been awarded a column, however, he would not

have received additional compensation.  <u>See</u> Mayk Dep. at 37; <u>see also</u> Deitz Aff. ¶ 11.

In 2005, the nominal payments of $20.00 per column ceased, and the writer no longer

received additional compensation for them.  <u>Id.</u>

      Currently, Mr. Mayk has assumed a role writing for the newspaper.  He writes a

feature entitled "News Makers," for which he researches and assembles information on

anyone prominent in the news.  <u>See</u> Mayk Dep. at 33; <u>see also</u> Deitz Aff. ¶ 12.

---

[5]  The defendant's practice for reporters who have an idea for a column is to have the
reporter present the idea to management and submit three columns for consideration.  <u>See</u> Deitz
Aff. ¶ 8; <u>see also</u> Gallagher Aff. ¶ 5.  When Mr. Mayk raised the issue of writing a column for
the newspaper, he was advised to follow that practice.  <u>See</u> Deitz Aff. ¶ 9; <u>see also</u> Gallagher Aff.
¶ 5.  Mr. Mayk submitted neither the idea nor the three columns.  <u>Id.</u>

In his affidavit, Mr. Deitz indicated that the defendant values Mr. Mayk as a good performer, and that it has rewarded Mr. Mayk with good performance evaluations and good pay increases.  See Deitz Aff. ¶ 13; see also Mayk Dep. at 16, 31-32.

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(c).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" only if it might affect the outcome of the suit under governing law. Id.

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set

forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. All inferences must be drawn and all doubts resolved in favor of the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Gordon v. Youmans, 358 F.2d 261, 262 (2d Cir. 1965); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985); Liberty Lobby, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Liberty Lobby, 477 U.S. at 252. If the non-moving party has met the extraordinarily low burden of evidence and offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

### A. ADEA Claims

#### 1. Disparate Treatment

In Count I of the complaint, Mr. Mayk alleges that he "has been and is being

irreparably harmed by the discriminatory actions[6] of the defendant." Compl. ¶ 48. Other

allegations in the complaint seem to suggest that Mr. Mayk believes he was being treated

differently from his younger co-workers because of his age. Id. ¶¶ 25, 29, 30, 33. It is

also worth noting that in his response to this motion for summary judgment, Mr. Mayk

incorrectly indicates that his complaint alleges violations of both the ADEA and the

Pennsylvania Human Relations Act ("PHRA"). The complaint, however, provides no

mention of the PHRA.

The central provision of the ADEA provides that it shall be unlawful for an

employer:

> (1)    to fail or refuse to hire or to discharge any individual or otherwise
>        discriminate against any individual with respect to his compensation, terms,
>        conditions, or privileges of employment, because of such individual's age;
>
> (2)    to limit, segregate, or classify his employees in any way which would
>        deprive or tend to deprive any individual of employment opportunities or
>        otherwise adversely affect his status as an employee, because of such
>        individual's age; or
>
> (3)    to reduce the wage rate of any employee in order to comply with this Act.

29 U.S.C. § 623(a).

To establish a disparate treatment claim under the plain language of the ADEA, a

---

[6] Although the remaining paragraphs of the complaint, Mr. Mayk's own testimony, and
the defendant's pleadings indicate that he remains employed by the defendant, one paragraph in
the complaint alleges that the "defendant had an illegal discriminatory motive for terminating
him." Compl. ¶ 46. Because it is clear that Mr. Mayk was not terminated, I will assume that the
allegations of that paragraph were erroneously included. Accordingly, I will strike Paragraph 46
from the complaint in its entirety.

plaintiff must prove that age was the "but-for" cause of the defendant's adverse decision. Gross v. FBL Financial Services, Inc., 129 S.Ct. 2343, 2350 (2009) (a plaintiff must prove by a preponderance of the evidence, which may be direct or circumstantial, that age was the "but-for" cause of the challenged employer decision). The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision. Id. at 2352. Shifting the burden of persuasion to the defendant is improper because the plain language of the ADEA requires the plaintiff to prove that the defendant took the adverse employment action "because of [the plaintiff's] age." Id. at 2350-51 (quoting 29 U.S.C. § 623(a)(1)). The Supreme Court construed this language in the statute as requiring that the plaintiff prove but-for causation from the outset of an ADEA case. Id.

In a recent case published after Gross, the Third Circuit Court of Appeals recognized that Gross expressed significant doubt about any burden-shifting under the ADEA, but concluded that the "but-for causation standard" required by Gross did not conflict with the continued application of the McDonnell Douglas[7] paradigm in age discrimination cases:

> Gross stands for the proposition that it is improper to shift the burden of persuasion to the defendant in an age discrimination case. McDonnell Douglas, however, imposes no shift in that

---

[7] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

particular burden.  <u>McDonnell Douglas</u> provides that, once the employee establishes a *prima facie* case, the burden of production (i.e., of going forward) shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  If the employer makes that showing, the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual.  <u>Tex. Dep't of Comm. Affairs v. Burdine</u>, 450 U.S. 248, 254-55, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  Throughout this burden-shifting exercise, the burden of persuasion, "including the burden of proving 'but for' causation or causation in fact, remains on the employee."  <u>Starceski</u>, 54 F.3d at 1095 n.4 (3d Cir. 1995)(citing <u>Burdine</u>, 450 U.S. at 253).  Hence, <u>Gross</u>, which prohibits shifting the burden of persuasion to an ADEA defendant, does not forbid our adherence to precedent applying <u>McDonnell Douglas</u> to age discrimination claims.

<u>Smith v. City of Allentown, et al.</u>, 589 F.3d 684, 691 (3d Cir. 2009).

To establish a *prima facie* case of age discrimination under the ADEA, a plaintiff must demonstrate that he (1) was over the age of 40; (2) was qualified for the position; (3) suffered an adverse employment decision; and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination.  <u>Barbee v. SEPTA, et al.</u>, 323 Fed. Appx. 159, 161 (2009) (quoting <u>Monaco v. Am. Gen. Assur. Co.</u>, 359 F.3d 296, 300-301 (3d Cir. 2004)); <u>see also</u> <u>Fasold v. Justice</u>, 409 F.3d 178, 185-186 (3d Cir. 2005); <u>Potence v. Hazleton Area Sch. Dist.</u>, 357 F.3d 366, 370 (3d Cir. 2004).

It is important to note, however, that there is no hard-and-fast rule covering what a plaintiff must show in order to establish the *prima facie* showing.  Rather, "the precise elements of a plaintiff's *prima facie* case may vary with the particular circumstances."

Waldron v. SL Indus., Inc., 56 F.3d 491, 494 n.3 (3d Cir. 1995); see also Geraci v. Moody-Tottrup Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996) (elements of the *prima facie* case must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination).  Because Mr. Mayk was not terminated from his employment with the defendant and could then not possibly satisfy the fourth element as stated, a showing that the circumstances of the adverse employment action gives rise to an inference of age discrimination would be sufficient to satisfy the fourth element of a *prima facie* case.  See Heilman v. Allegheny Energy Serv. Corp., 2009 U.S. App. LEXIS 24937, at 6-7 (3d Cir. 2009); see also Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-411 (3d Cir. 1999).

Applying the evidence of record here, it is certain that Mr. Mayk establishes the first two elements of the *prima facie* case.  He was born in 1951 and would have been over the age of forty years during the relevant period.  It is just as certain that Mr. Mayk was also qualified for his position.  Over the years, he continued to receive the highest annual reviews offered by the company.  He was promoted from part-time copy editor to full-time copy editor, and then to Metro Editor.  When Mr. Mayk requested a demotion to copy editor for health reasons, his company granted that request yet valued him enough as an employee to continue to pay his higher salary.  In fact, Mr. Deitz indicated in his affidavit that the newspaper has valued Mr. Mayk as a good performer throughout the years, and that his contributions to the newspaper were appreciated "both before and after

this situation came to" the newspaper's attention.  See Deitz Aff. ¶ 13.

It is at the third element of the *prima facie* case where Mr. Mayk's claim of disparate treatment reaches its conclusion.  To have satisfied that element, the alleged adverse employment action would have had to be sufficiently severe enough to have altered Mr. Mayk's compensation, terms, conditions, or privileges of employment, or to have deprived or tended to deprive him of employment opportunities or otherwise adversely affected his status as an employee.  Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296-1297 (3d Cir. 1997), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); see also 29 U.S.C. § 623(a); Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)) (an "adverse employment action" is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment").  It is not necessary for Mr. Mayk to have demonstrated that he was threatened with or experienced economic or tangible discrimination.  Id.  But by the same token, not every insult, slight, or unpleasantness gives rise to a valid claim.  Id. at 1297.  Although the type of adverse employment action that satisfies the standard is often one that results in economic injury, it can also include, among others, "reassignment with significantly different responsibilities," "failure to promote," "a less distinguished title," "a material loss of benefits," and "significantly diminished material responsibilities."  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (an employment action is not materially adverse if it merely bruises the

ego, results in a demotion without change of pay, benefits, duties, or prestige, or leads to a merely inconvenient reassignment).

Mr. Mayk has failed to establish that the actions of the defendant had *any* adverse affect on his employment. On the contrary, the evidence has shown that the defendant's conduct toward Mr. Mayk has been continually non-discriminatory. In fact, the defendant: promoted Mr. Mayk at least twice; granted his request for a demotion; chose to continue to pay him at his higher rate of salary notwithstanding the demotion; accommodated his need to work various schedules; granted his requests for additional breaks and time off for reasons of illness; and continued to give him the highest annual rating possible.

Moreover, Mr. Mayk's speculative belief that he may have lost a few nominal payments for writing columns does not allege harm substantial enough to alter his terms and conditions of employment or to sustain a claim that he suffered an adverse employment action. Mr. Mayk offered no evidence of when the defendant's policy of paying for columns stopped, or how many columns he could have potentially written before the policy of paying for columns stopped.

The evidence also belies Mr. Mayk's contention that he was prevented from writing a column because of his age, and that the defendant only offered significantly younger reporters the opportunity to write columns. In his affidavit, Mr. Deitz provided the birth dates of the defendant's columnists, most of which were reporters. The majority

of these were also over forty during the relevant period:  Mr. Forester (April 2, 1947);

Donald Spatz (April 3, 1949); Mary Young (June 11, 1949); Poncho Peña (April 17,

1950); John Fidler (April 3, 1952); Bill Uhrich (April 28, 1954); Daniel Kelly (November

12, 1958); Keith Mayer (July 2, 1959); and Jason Brudereck (October 20, 1976).  See

Deitz Aff. ¶ 10.  Mr. Mayk does not attempt to refute this evidence.

The record also shows that Mr. Mayk was continually counseled to submit any

idea for a column to management along with three sample columns for consideration.  He

chose to refuse to follow the defendant's practice.  Accordingly, it is clear that Mr.

Mayk's claim that the defendant only awarded columns to individuals under the age of

thirty is self-serving speculation that is far from sufficient to defeat summary judgment.

Kiburz v. England, 2010 U.S. App. LEXIS 1006, *24 (3d Cir. Jan. 19, 2010) (citing

Acumed LLC v. Advanced Surgical Servs., 561 F.3d 199, 228 (3d Cir. 2009)); see also

Lexington Ins. Co. v. W. Pa. Hosp., 423 F.3d 318, 332-33 (3d Cir. 2005); Robertson v.

Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990) (an inference based upon

speculation or conjecture does not create a material factual dispute sufficient to defeat

entry of summary judgment).

After a careful review of the pleadings and the evidence of record including Mr.

Mayk's own testimony, I can find no adverse employment action suffered by Mr. Mayk,

and I must conclude that he is thus unable to establish a *prima facie* case of age

discrimination.  Furthermore, the defendant presented clear, undisputed evidence that

individuals as old, and even older than Mr. Mayk were permitted the opportunity to write a column at the newspaper. Accordingly, I will enter judgment on behalf of the defendant in Count I.

## 2. **Disparate Impact**

In Count II, Mr. Mayk seems to misunderstand the concept of a disparate impact claim under the ADEA. He offers no evidence or makes no contention that a "facially-neutral practice" of the defendant had a disproportional impact on members of his protected class, i.e., those employees over forty. See Jones v. Sch. Dist. of Phila., 198 F.3d at 411. Instead, Mr. Mayk alleges that, in the alternative, even if he is unable to prove the defendant had a motivation to discriminate against him, its actions nevertheless had a disparate impact on him due to his age. See Compl. ¶ 51. He further alleges that younger employees have not been adversely impacted in the same manner he has been adversely impacted. Id. ¶ 52.

Disparate impact cases "should proceed in two steps: (1) the plaintiff must prove that the challenged policy discriminates against members of a protected class, and then (2) the defendant can overcome the showing of disparate impact by proving a 'manifest relationship' between the policy and job performance." El v. SEPTA, 479 F.3d 232, 239 (3d Cir. 2007). It "is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is responsible for isolating and identifying the specific employment practices

16

that are allegedly responsible for any observed statistical disparities." Smith v. City of Jackson, 544 U.S. 228, 241 (2005).

Mr. Mayk does not address his claim of disparate impact in his response to this motion for summary judgment. He has identified no evidence of a specific employment practice or policy responsible for a disparate impact, nor any statistical disparity that exists at the defendant newspaper. He further offers no evidence to buttress the bald assertion of an alleged unfair impact on him compared to younger employees. Because Mr. Mayk fails to connect these allegations to any specific employment practice or statistical disparity, as required, I will also grant summary judgment in the defendant's favor in Count II. See Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007).

**B. ADA Claim**

In Count III, Mr. Mayk alleges that (1) the defendant was aware of his health conditions; (2) his working conditions exacerbated his anxiety and depression; (3) his medical conditions were disabilities as defined in the ADA; (4) he could perform the essential functions of his job with a reasonable accommodation; (5) the defendant refused to grant him an accommodation even thought the accommodation would not have constituted a significant hardship to the defendant; and (6) the defendant discriminated against him because of his alleged disability. See Compl. ¶¶ 56-65.

The ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment."

Turner v. The Hershey Company, 440 F.3d 604, 607-608 (3d Cir. 2006) (quoting 42

U.S.C. § 12112(a)).  The Act defines a "qualified individual with a disability" as "an

individual with a disability who, with or without reasonable accommodation, can perform

the essential functions of the employment position that individual holds or desires."  Id.

(quoting 42 U.S.C. § 12111(8)).  An employer discriminates against a qualified individual

when it does "not make reasonable accommodations to the known physical or mental

limitations of the individual unless the [employer] can demonstrate that the

accommodation would impose an undue hardship on the operation of the business of the

[employer]."  Id. (quoting 42 U.S.C. § 12112(b)(5)(A)).  "Reasonable accommodation"

means measures such as "job restructuring, part-time or modified work schedules,

reassignment to a vacant position, acquisition or modification of equipment or devices,

. . . and other similar accommodations for individuals with disabilities."  Id. (quoting 42

U.S.C. § 12111(9)).

The plaintiff has the initial burden of establishing a *prima facie* case in an ADA

action.  Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996); Newman v.

GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d Cir. 1995).  To establish a *prima facie* case

of disability-based discrimination under the ADA, a plaintiff must demonstrate that he:

(1) has a disability within the meaning of the ADA; (2) is otherwise qualified to perform

the essential functions of the job, with or without reasonable accommodations by the employer; and (3) has suffered an adverse employment action because of that disability. Turner v. The Hershey Company, 440 F.3d at 611; see also Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998). Because it is dispositive here, I need only address the third element.

Even if Mr. Mayk could show that he was disabled under the ADA,[8] his claim would still fail. Mr. Mayk suggests that the adverse employment action he suffered was the failure of the defendant to engage earnestly in the interactive process required under the ADA. To show that an employer has violated its duty to engage in the interactive process, a disabled employee must demonstrate: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Taylor v. Phoenixville School District, 184 F.3d 296, 319-320 (3d Cir. 1999).

As shown above, Mr. Mayk has not demonstrated that he has suffered any adverse

---

[8]  For Mr. Mayk to have established the existence of a "disability" under the ADA, he would have had to show that he: (1) had a physical or mental impairment that substantially limited one or more major life activities; (2) had a record of such impairment; or (3) was "regarded as" having such an impairment by his employer. Marinelli v. City of Erie, 216 F.3d 354, 359 (3d Cir. 2000). Because he has failed to establish that he suffered an adverse employment action, whether Mr. Mayk has successfully established a disability is not dispositive here.

employment action by the defendant. No where in the record does it indicate that Mr. Mayk requested an accommodation or assistance for his alleged disability which went unanswered by the defendant. Mr. Mayk testified that throughout his employment, the defendant accommodated Mr. Mayk's requests to work various schedules because of his impairments. The defendant also granted his requests for extra time off or for additional breaks at work due to his migraine headaches. On several occasions, he took extended leaves from work for both physical and mental health reasons. Yet, he testified, upon return from those leaves, Mr. Mayk experienced no affect on his position or status with the defendant. He also conceded that he received no formal disciplines, suspensions, decreases in pay, or other punishment during his employment with the newspaper.

Furthermore, the record is void of evidence to suggest that the defendant should have known that Mr. Mayk sought any additional accommodation. While the notice of a desire for an accommodation does not have to be in writing, be made by the employee, or formally invoke the magic words "reasonable accommodation," the notice nonetheless must make clear that the employee wants assistance for his disability. Taylor v. Phoenixville School District, 184 F.3d at 313. The record reflects that the only requests for accommodation made by Mr. Mayk of the defendant were granted by the defendant. Because there exists no other evidence from which a request for accommodation could be inferred, the defendant was under no legal obligation to engage in the interactive process. Id. at 319-320.

By failing to prove the incidence of an adverse employment action, Mr. Mayk cannot make out a *prima facie* case for employment discrimination based on disability. Accordingly, summary judgment in favor of the defendant is also appropriate on this claim. Jones v. United Parcel Service, 214 F.3d 402, 408 (3d Cir. 2000) (finding, in the ADA context, that the employer could not be liable on a failure to accommodate claim because employee failed to make clear that the employee wanted assistance for his or her disability).

An appropriate Order follows.